AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No.  3  21 mj 295 |
| INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100010114351428 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | ) ) ) |

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A.  This court has authority to issue this warrant under 18 U.S.C. sections 2703(c)(1)(A) and 2711(3) (A) and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized):*

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 846 and 841(a)(1) | Conspiracy to possess with intent to distribute a controlled substance. |
| 21 USC 843 | Use of a communications facility to commit a felony. |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested

under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Robert M. Buzzard*
*Applicant's signature*

SA ROBERT BUZZARD, FBI
*Printed name and title*

Sworn to before me and signed in my presence via telephone.

Date:  July 29, 2021

City and state:  Dayton, Ohio

Peter B. Silvain, Jr.
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100010114351428 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 2  21 mj 295 <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Robert M. Buzzard, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent ("SA") with Federal Bureau of Investigation ("FBI"), and have been so employed since January of 2002. I am currently assigned to the Cincinnati Division, Dayton Resident Agency. As such, I am charged with investigating crimes against the United States of America, including but not limited to violations of Title 18 and Title 21 of the United States Code (U.S.C.). I have received training in drug trafficking investigations and participated in numerous narcotics-related investigations (ultimately leading to successful

prosecutions) that involved surveillance, the execution of search warrants, gathering evidence of money laundering, interviewing suspected drug traffickers, and supervising the activities of informants who provided information and assistance which resulted in the seizure of narcotics. I am familiar with federal drug laws, and am aware that it is a violation of Title 21, U.S.C., Sections 841(a)(1) and 846 to distribute and possess with intent to distribute controlled substances, as well as conspire to do the same. I am also aware that it is a violation of Title 21, U.S.C., Section 843(b) to use a communications facility to commit a felony. I am also aware through my training and experience that drug traffickers commonly use cellular telephones, electronic devices, and social media platforms to facilitate their drug trafficking activities/crimes.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21 U.S.C. §§ 841 and 846 as well as 843 have been committed by **DAVID GULLATTE** (**"GULLATTE"**), users of Facebook user ID 100010114351428, and possibly other unidentified co-conspirators. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5.      In July of 2020, I was contacted by an individual, hereinafter referred to as Confidential Human Informant One ("CHS1"). CHS1 has provided information in the past, which has been corroborated by independent investigation and proved truthful and reliable.

2

Additionally, information previously provided by CHS1 had led investigators to seizures of large quantities of narcotics. CHS1 has prior felony state convictions for drug and weapons offenses. CHS1 is not providing information for consideration in a pending criminal matter or for monetary compensation. CHS1 has personally known **GULLATTE** for a number of years and personally knows that **GULLATTE** has engaged in the selling of narcotics in the Dayton area for the last ten years. CHS1 reported that **GULLATTE** was part of a drug trafficking organization ("DTO") operating in the Dayton, Ohio area. CHS1 provided that **GULLATTE** and members of his DTO are being supplied heroin, fentanyl, and crystal methamphetamine from a DTO based in Mexico and operating in the Los Angeles, California, area. CHS1 further provided that **GULLATTE**, and/or members of his organization, arrange for the purchase and shipment of narcotics from the Los Angeles, California area, to Dayton, Ohio, utilizing United States Postal Service and other mail service providers. CHS1 advised that a family member of **GULLATTE**, known to the investigative agents and referred to herein as J.H., was recently interdicted by law enforcement authorities in an airport with approximately $70,000 in U.S. currency. CHS1 further advised that J.H. was flying to Los Angeles, California, with the currency and believed the currency was being transported by J.H. on behalf of **GULLATTE** as payment for narcotics.

6. In July of 2020, FBI SA Nick Graziosi was contacted by an individual, hereinafter referred to as Cooperating Witness One ("CW1"). CW1 has provided information in the past, which has been corroborated by independent investigation and proved truthful and reliable. CW1 is currently providing information to agents in consideration in a pending drug trafficking investigation. CW1 has no additional criminal history. CW1 provided that he/she had firsthand knowledge of a phone number that is known to CW1 to be utilized by **GULLATTE**, being **937-**

**269-2882**, also referred to herein as the **"Target Cellular Device."** CW1 further provided that he/she had firsthand knowledge that on or about the week of July 13, 2020, **GULLATTE** traveled to Los Angeles, California, to arrange for the purchase and shipment of a quantity of narcotics utilizing United States Postal Services to the Dayton, Ohio, area. CW1 further provided that he/she had firsthand knowledge that **GULLATTE** utilized the **Target Cellular Device** to arrange for the purchase and shipment of various quantities of narcotics.

7.     On July 17, 2020, SA Graziosi requested the assistance of United States Postal Service ("USPS") Inspector Joe Rossiter. Based on information provided by CW1, Inspector Rossiter identified a suspicious package sent from Los Angeles, California, weighing approximately 4 pounds and 15.20 ounces, which was scheduled for delivery on July 20, 2020, to 70 Vinway Court, Apt. 5, Dayton, OH, tracking number 9505 5130 0922 0198 5858 09 (hereinafter "the Package").

8.     On July 20, 2020, Inspector Rossiter located the Package after it arrived at the USPS Network Distribution Center ("NDC"), located in Cincinnati, Ohio. Inspector Rossiter coordinated with Dayton Police Department ("DPD") Officer Jeremy Stewart to conduct a narcotics-detection K9 "free air" check of the outside of the Package. DPD Officer Stewart thereafter presented the Package to certified narcotics-detection K9 Weston. K9 Weston alerted positively to the presence or odor of a narcotic or other controlled substance.

9.     On July 21, 2020, and pursuant to the certified narcotics-detection canine positive alert to the Package, Inspector Rossiter sought and obtained a federal search warrant authorizing a search of the contents of the Package, which was signed by United States Magistrate Judge Sharon L. Ovington. Pursuant to the federal search warrant referenced herein, myself, Inspector Rossiter, and SA Graziosi searched the contents of the Package, which revealed a bundle of

4

suspected narcotics that weighed approximately 2.9 pounds (1.315 kilograms). I conducted a field test of a sample from the bundle containing suspected narcotics utilizing a Thermo Scientific TruNarc Handheld Narcotics Analyzer, which indicated a positive response for the presence of Cocaine.

10. On August 21, 2020, CW1 reported **GULLATTE** was expecting another shipment of narcotics from his supplier in California. This time, CW1 advised the supplier was mailing the narcotics via FedEx to **GULLATTE** at 70 Vinway Ct., Apt. 5, Dayton, Ohio 45415.

11. A FedEx representative in Dayton confirmed an approximate ten-pound parcel, tracking number 396057105638, had been mailed on August 21, 2020 from California and was destined for 70 Vinway Ct., Apt. 5, Dayton, Ohio 45415 (hereinafter "the Parcel"). The Parcel was addressed to "Jessica Perez" and was scheduled for delivery on August 25, 2020. Prior to delivery, the Parcel would be held at the FedEx facility located at 3605 Concorde Drive, Vandalia, Ohio 45377.

12. On August 25, 2020, I responded to the FedEx Facility at 3605 Concorde Drive and located the Parcel with assistance from Dayton Police narcotics detectives. I confirmed the tracking number on the Parcel and noted the Parcel was addressed to "Jessica Perez" at 70 Vinway Ct., Apt. 5, Dayton, Ohio 45415, with a contact number of 323-251-7052.

13. The FedEx parcel, tracking number 396057105638, was seized by me and transported to the Montgomery County Sheriff's Office narcotics office. I subsequently requested the assistance of Ohio State Highway Patrol K9 Trooper Jason Barhorst and his State of Ohio drug certified K9 partner Roy. Trooper Barhorst and K9 Roy conducted a free air sniff on the FedEx parcel, tracking number 396057105638. K9 Roy gave a positive alert to the odor of narcotics on the Parcel. That same day, I obtained a search warrant for the Parcel, which was authorized by U.S. Magistrate Judge Michael J. Newman. A subsequent search of the Parcel

5

revealed a bundle of suspected narcotics concealed inside. The bundle weighed approximately 630 grams and the contents field tested positive for the presence of fentanyl.

14. On or about September 2, 2020, I learned through CW1 that **GULLATTE** was arranging for the transportation of crystal methamphetamine from Atlanta, Georgia for sale in Dayton, Ohio. On September 3, 2020, FBI Task Force Officer ("TFO") Fred Zollers obtained a state of Ohio GPS tracking warrant for a blue Ford F150 pickup truck that **GULLATTE** is known to drive and utilize. After the installation of the GPS, the Ford F150 pickup truck traveled to the area of Atlanta, Georgia from Dayton, Ohio. During the early morning hours of September 4, 2020, GPS data indicated the Ford F150 was traveling back to Ohio. At approximately 9:40 AM, Ohio State Highway Patrol K9 Trooper Joe Weeks conducted a traffic stop on the Ford F150 pickup on Interstate 75 in Montgomery County, Ohio. Trooper Weeks stopped the vehicle in part because the Ohio license plate returned to a 2002 Ford F150 pickup truck, however, the pickup truck appeared to be a 2020 model. Trooper Weeks contacted the driver and sole occupant Marcus A. Gullatte, who is believed to be **GULLATTE**'s father. During the stop, Trooper Weeks utilized his state certified narcotics detection K9 partner Bleck to conduct a free air sniff around the vehicle. K9 Bleck gave a positive alert to the odor of narcotics around the vehicle. A subsequent search of the Ford F150 pickup truck yielded a carry-on size piece of luggage in the rear of the truck containing 30 wrapped bundles. The package weight for the 30 bundles was approximately 13,741 grams. I field tested one of the bundles utilizing a Thermo Scientific TruNarc Handheld Narcotics Analyzer, and received a positive response for the presence of methamphetamine. Trooper Weeks also located and seized three cellular telephones and one Samsung tablet from Marcus A. Gullatte following the traffic stop.

6

15.     Based on my training and experience, I know that large-scale narcotics traffickers like **GULLATTE** utilize cellular telephones, digital devices, and social media communication platforms to communicate with their suppliers and customers.  I know those communications include in part; calls, text messages, and messaging applications.  During my investigation of **GULLATTE**, I learned he utilizes an active Facebook account under the name "Dave Gullatte," user ID 100010114351428.

16.     CW1 corroborated **GULLATTE** utilizes the target Facebook user account and has first-hand knowledge that **GULLATTE** sends messages through his Facebook account to other drug customers.  More specifically, CW1 knows **GULLATTE** uses the Facebook Messenger feature on his Facebook account to send messages to drug customers advertising drug amounts, price, and product description.

17.     On September 22, 2020, a preservation letter was sent to Facebook for user ID 100010114351428, which requested information available regarding the user account from July 6, 2020 through September 22, 2020, be preserved pending the issuance of a federal search warrant.   On September 28, 2020, a federal search warrant was obtained for **GULLATTE'S** Facebook account (user ID 100010114351428), authorized by U.S. Magistrate Judge Sharon L. Ovington (case number 3:20MJ453).  In late October 2020, I received the requested account information from **GULLATTE'S** Facebook account.  Facebook records indicate **GULLATTE** established the account on July 15, 2015.  **GULLATTE'S** registered email for the Facebook account was davegullatte937@gmail.com.

18.     A review of the information showed **GULLATTE** uses his Facebook account to communicate with others (known and unknown) to facilitate his drug trafficking activities. Specifically, in September 2020, **GULLATTE** communicated with an individual utilizing the

7

Facebook name "Salim Abdul Kareem" and discussed having "Reg or Fetty" for sale. I know through my training and experience the street term "Fetty" is commonly used by drug traffickers and drug users when they are referring to Fentanyl. **GULLATTE** and "Salim Abdul Kareem" also discussed the sale of "zips of cream" and prices. I know through my training and experience that drug traffickers commonly refer to ounces as "zips" and crystal methamphetamine as "cream." I also reviewed Facebook messenger communications between **GULLATTE** and an individual using the Facebook name "Linn Street Bankhead." During those communications, **GULLATTE** messaged "Linn Street Bankhead" "cream in bra" meaning he has crystal methamphetamine to sell. **GULLATTE** then sent "Linn Street Bankhead" a photo of a large plastic bin containing several wrapped bundles of suspected narcotics. **GULLATTE** messaged "Linn Street Bankhead" the price per pound of suspected crystal methamphetamine was $4,800. **GULLATTE** also messaged "Linn Street Bankhead" his phone number 937-269-2882.

19.    In March of 2021, FBI Task Force Officer Fred Zollers was contacted by Detective Tackett with the Cincinnati Police Department Narcotics Unit. Detective Tackett received Facebook account records pertaining to "Linn Street Bankhead" via court order on a separate investigation. During a review of those Facebook records, Detective Tackett discovered a video **GULLATTE** sent "Linn Street Bankhead" via Facebook on March 10, 2021. The video shows the hand of an unknown person opening what appears to be a kilogram of illegal narcotics. The suspected kilogram was wrapped in multiple layers of tape/packaging material and possessed the image of a star pressed into the suspected narcotics. I know through my training and experience narcotics traffickers commonly send videos or electronic pictures of illegal narcotics to their customers as a marketing strategy to show the quality and amount of the narcotics for sale.

8

20.     Another short video stored on **GULLATTE'S** Facebook account showed multiple bundles matching the appearance of the 30 bundles of crystal methamphetamine seized from **GULLATTE'S** father on September 4, 2020 (previously detailed in paragraph 14 of this affidavit). In the video, the bundles were stacked on a kitchen countertop in a residence with a carry-on size piece of luggage laying open and empty on the floor. The carry-on piece of luggage appeared to be the same one that contained the 30 bundles of crystal methamphetamine seized on September 4, 2020. The video is recorded in color and shows the size, shape, color and layout of the kitchen counter, sink, and cabinet area as well as the flooring.

21.     On December 29, 2020, I conducted surveillance on **GULLATTE** in Dayton, Ohio. During the surveillance, Dayton Police Patrol Officer Hammock conducted a traffic stop on the vehicle **GULLATTE** was driving for a traffic violation. During the traffic stop, **GULLATTE** provided his home address as 914 Georgian Point Dr., Lawrenceville, GA and his cell phone number as 937-269-2882.

22.     I conducted an online search of the address 914 Georgian Point Dr., Lawrenceville, GA and found it to be a single-family residence. The real estate website Trulia depicted exterior and interior photos of the residence, which I reviewed. I noted an interior photograph of the residence that depicted the kitchen counter, kitchen sink, cabinet, and flooring. The area and items depicted in the interior photograph matched **GULLATTE'S** Facebook video wherein multiple bundles of suspected methamphetamine were shown on a kitchen countertop (previously described in paragraph 20).

23.     On July 13, 2021, I was contacted by FBI Special Agent Andrew Eilerman regarding a known individual who was arrested in the Northern District of Ohio after traveling to Dayton, Ohio and purchasing multiple ounces of methamphetamine and several grams of

9

fentanyl from **GULLATTE** on July 9, 2021. During an interview with the individual following arrest, he/she identified **GULLATTE** as his/her supplier for illegal narcotics. The individual reported knowing **GULLATTE** for years and explained **GULLATTE** would direct him/her to a residence at 1636 W. First St., Dayton, Ohio to pick up narcotics. I am familiar with 1636 W. First St., Dayton, Ohio and know **GULLATTE'S** mother lives at that residence. The individual advised **GULLATTE'S** phone number is 937-269-2882. The individual reported he/she pays for narcotics he/she receives from **GULLATTE** via CashApp. **GULLATTE'S** CashApp account is under "$DaveGullatte." SA Eilerman viewed and confirmed the CashApp transaction between the individual and **GULLATTE** on July 9, 2021, which corresponded with the narcotics purchase.

24.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

25.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

26.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual

10

Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

27.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

28.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

11

29.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

30.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

31.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

32.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

33.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

12

34.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

35.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

36.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

37.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

38.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like

13

Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

39.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account

activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

40.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

41.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

42.     Based on the foregoing, I request that the Court issue the proposed search warrant.

43.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

44.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

45.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_Robert M. Buzzard_

Robert M. Buzzard
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on July 29, 2021

Peter B. Silvain, Jr.
United States Magistrate Judge

16

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID
100010114351428 that is stored at premises owned, maintained, controlled, or operated by
Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

I. **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession,

custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is

located within or outside of the United States, including any messages, records, files, logs, or

information that have been deleted but are still available to Facebook, or have been preserved

pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the

following information to the government for each user ID listed in Attachment A:

    (a)    All contact and personal identifying information, including for user ID

           100010114351428: full name, user identification number, birth date, gender,

           contact e-mail addresses, physical address (including city, state, and zip code),

           telephone numbers, screen names, websites, and other personal identifiers.

    (b)    All activity logs for the account and all other documents showing the user's posts

           and other Facebook activities from September 23, 2020 through July 29, 2021;

    (c)    All photos and videos uploaded by that user ID and all photos and videos

           uploaded by any user that have that user tagged in them from September 23, 2020

           through July 29, 2021, including Exchangeable Image File ("EXIF") data and any

           other metadata associated with those photos and videos;

    (d)    All profile information; News Feed information; status updates; videos,

           photographs, articles, and other items; Notes; Wall postings; friend lists, including

           the friends' Facebook user identification numbers; groups and networks of which

           the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from September 23, 2020 through July 29, 2021, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from September 23, 2020 through July 29, 2021;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

3

II. **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21 U.S.C. §§ 841 and 846 as well as 843 involving David Gullatte since September 23, 2020, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Evidence indicating the possession, transportation, sale, manufacture, and distribution of illegal drugs to include the use of a communication facility to accomplish those acts.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed

4

electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

    b.    such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

        1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

        2.    the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

6

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                Signature